818 A.2d 424 (2003)
358 N.J. Super. 473
The BAR ON THE PIER, INC., Plaintiff-Appellant,
v.
David BASSINDER, Agnes Ricci, and Thomas Ricci, partners d/b/a Scotty's Arcade, David Bassinder, individually, Agnes Ricci, individually, Thomas Ricci, individually, Scotty's Arcade, a general partnership, and Scotty's Long Branch Amusements, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 21, 2003.
Decided March 12, 2003.
*426 William J. Wolf, Lakewood, argued the cause for appellant (Bathgate, Wegener & Wolf, attorneys; Mr. Wolf, on the brief).
Guy P. Ryan, Toms River, argued the cause for respondents (Russo, Secare, Ford, Delanoy & Martino, attorneys; Mr. Ryan, on the brief).
Before Judges HAVEY, A.A. RODRÍGUEZ and WELLS.
*425 The opinion of the court was delivered by HAVEY, P.J.A.D.
This is a contract dispute relating to the sale of a plenary retail consumption liquor license by plaintiff, The Bar on the Pier, Inc., to defendants (collectively referred to as David Bassinder or Bassinder). Bassinder agreed to purchase the license for $242,500, payable $17,500 upon execution of the agreement, $17,500 180 days thereafter, and the balance of $207,500 upon "occurrence" of one of six enumerated events described in paragraph 2d of the agreement. One such "occurrence" is Bassinder's "sale" of premises he leased on the Long Branch Pier from Ric-Cic Co. Plaintiff appeals from a judgment of dismissal entered at the close of plaintiff's case. R. 4:37-2(b).
The central issue on appeal is whether the condemnation of the subject property by the City of Long Branch constituted a "sale" of the premises by Bassinder. If so, the "sale" triggered Bassinder's obligation to pay the balance due under paragraph 2d. We conclude that the condemnation did not constitute a "sale" of the premises by Bassinder as that term was contemplated by the parties. We therefore affirm.
The salient facts are undisputed. Prior to 1987, plaintiff operated a nightclub on the Long Branch Pier. A 1987 fire on the pier totally destroyed plaintiff's business. During the same time Bassinder's was operating Scotty's Long Branch Arcade, an amusement facility also situate on the pier. Bassinder's arcade occupied its premises pursuant to two ninety-nine year leases with Ric-Cic Co.[1] His arcade was also totally destroyed by the fire. See Ric-Cic Co. v. Bassinder, 252 N.J.Super. 334, 336-37, 599 A.2d 943 (App.Div.1991).
Because plaintiff's nightclub was destroyed, it was desirous of selling its liquor license. By written agreement dated October 30, 1987, prepared by plaintiff's attorney, it agreed to sell the license to Bassinder[2] for $242,000, payable by two *427 $17,500 payments, and, pursuant to paragraph 2d of the agreement, the balance of the $207,500 as follows:
upon the occurrence of the earlier of the following:
i. The Liquor License or any other liquor license is actively used on the Premises; or
ii. The Liquor License is transferred by the [Purchaser] in a place to place transfer, to any other property that is located within three hundred (300) feet of the Premises; or
iii. The Premises is sold by the Purchaser to a third party; or
iv. The Purchaser assigns, to a thirty party, the Leases, or
v. The Purchaser voluntarily terminates one or both of the Leases; or
vi. The Liquor License is sold to a third party in a person to person transfer....
Paragraph 9 of the agreement, entitled "Reversion of Seller," provides that the liquor license reverts to plaintiff:
upon the occurrence of any one of the following:
(a) One or both of [Bassinder's] Leases are invalidated or voided by the order of a court of competent jurisdiction; or
(b) One or both of the Leases are terminated by the landlord; or
(c) One or both of the Leases are foreclosed in a mortgage foreclosure action or in any other action brought by a secured creditor; or
(d) The Purchaser for any reason whatsoever [loses] the interest bestowed upon it by one or both of the Leases; or
(e) Premises, because of restrictions in one or both of the Leases or because of governmental regulation, cannot be used
as Premises that are licensed for the retail sale of alcoholic beverages. Paragraph 9 also provides: "However, in lieu of the rights bestowed upon it by this paragraph 9 [plaintiff] may waive this right of reversion in favor of the rights bestowed upon it by subparagraph 2.d." The agreement does not have a time limit for the triggering of any of the events set forth in either paragraphs 2d or 9.
Bassinder also executed a non-interest-bearing promissory note in favor of plaintiff for the amount of $207,500, due and payable upon the occurrence of the earlier of the six events listed in paragraph 2d of the parties' agreement. The note was personally guaranteed by Bassinder.
On May 10, 1988, the City of Long Branch adopted a resolution approving the transfer of the liquor license from plaintiff to Bassinder. On June 24, 1997, the City filed a declaration of taking which rendered the City owner of the premises leased by Bassinder from Ric-Ric Co. The City subsequently instituted a condemnation action against Ric-Cic in which all the tenants on the pier, including Bassinder, were named as defendants. In the condemnation action, the court determined that, by virtue of the "eminent domain clause" in Bassinder's leases with Ric-Cic Co., the condemnation action by the City terminated his leasehold interest in the premises, and therefore he had no standing to share in any of the condemnation proceeds.
This ruling notwithstanding, plaintiff filed an action against Bassinder seeking a declaration that he was required to pay plaintiff the balance of the $207,500 due under the agreement and accompanying promissory note. During the nonjury trial, Francis Marincola, plaintiff's principal, advanced the proposition that under paragraph *428 9, plaintiff had the right to demand payment "in lieu of" a reversion of the license to it. On this point, Marincola recognized that paragraph 9 did not explicitly give plaintiff that right. He claimed, however, that the "in lieu of" clause was intended to read "in favor of [plaintiff] getting paid the monies," instead of "in favor of the rights bestowed ... by paragraph 2.d." He admitted that he should have drafted the agreement to be "very clear with that.... That is probably why we are here.". Alternatively, Marincola claimed that the City's condemnation of the subject property constituted a "sale" under paragraph 2d, thereby triggering Bassinder's obligation to pay the balance due under the agreement.
According to Marincola, prior to the parties' agreement plaintiff had a "monopoly" because no other licensed premises could be operated on the pier. However, since the agreement, the City has passed an ordinance permitting beachfront property owners to hold liquor licenses. It was Marincola's view that the new ordinance had the effect of devaluing plaintiff's license.
The trial court granted Bassinder's motion for judgment at the close of plaintiff's evidence. It ruled that condemnation of the subject property had triggered paragraph 9 of the parties' agreement, because, by court order, Bassinder's rights under his leases had been terminated. However, the court determined that paragraph 9 entitled plaintiff only to a reversion of the license, and not the payment of the balance due under the agreement. The court reasoned that any other interpretation would be plainly contrary to the plain language of the provision. The court further found that none of the conditions in paragraph 2d had occurred so as to trigger the obligation of Bassinder to pay the balance of the purchase price. In an earlier ruling the court had determined that condemnation of the property did not constitute a "sale" under paragraph 2d. In reaching that conclusion, the court relied on case law indicating that condemnations were "involuntary" transfers of title, rather than "sales" of property.

I
Plaintiff first argues that Bassinder became obligated to pay the balance due under the agreement pursuant to paragraph 9 when he lost his interest in his leasehold by virtue of the City's condemnation of the subject property. As noted, paragraphs 9a and 9d call for the reversion of the license upon the invalidation of Bassinder's leases by court order, or in the event he "for any reason whatsoever [loses] the interest ... in the leases." Plaintiff focuses on the caveat in paragraph 9, giving it the right to waive reversion "in favor of the rights bestowed upon it by subparagraph 2d," and reasons that the only "right" logically intended was the "right for [plaintiff] to receive $207,500 from Bassinder." We reject the argument.
In interpreting a contract our goal is to ascertain the intent of the parties as revealed by the language used by them. Jacobs v. Great Pacific Century Corp., 104 N.J. 580, 586, 518 A.2d 223 (1986). We may not make a better contract for either party, or supply terms that have not been agreed upon. Graziano v. Grant, 326 N.J.Super. 328, 342, 741 A.2d 156 (App. Div.1999). Essentially, plaintiff's contention tracks Marincola's trial testimony. As noted, he testified that it was his intention in drafting paragraph 9 that, in lieu of reversion of the license, plaintiff was entitled to payment of "the monies" due it if Bassinder lost his leasehold. However, that is not what paragraph 9 says; it provides clearly that plaintiff may waive *429 reversion "in favor of the rights bestowed upon [plaintiff] by subparagraph 2d." Those "rights" are predicated upon the occurrence of one of six events. Even if we were to find an ambiguity in the clause, which we do not, the ambiguity must be resolved against plaintiff, the party who drafted the instrument. In re Miller's Estate, 90 N.J. 210, 221, 447 A.2d 549 (1982). If plaintiff wanted the right to demand payment under paragraph 9 in lieu of reversion, it should have so stated in the agreement.

II
Plaintiff also contends that the City's condemnation of the subject premises constituted a "sale" under paragraph 2d(iii), which triggers Bassinder's obligation to pay if "the Premises is sold by the Purchaser to a third party...." (Emphasis added). We disagree.
Paragraph 2d(iii) appears to contemplate Bassinder's obligation to pay only upon "sale" of the premises by him. This event could only have occurred had Bassinder prevailed in the condemnation proceeding by convincing the court that he was the owner of the subject property by virtue of his ninety-nine year leases. However, as noted, his ownership claim was rejected in the condemnation case, and his leasehold was extinguished by virtue of the "eminent domain" clause under his leases. Consequently, if in fact the condemnation constituted a "sale," it was Ric-Cic, the property title holder of the subject property, who "sold" the premises to the City, not Bassinder.[3]
The trial court did not engage in the above-described interpretation of paragraph 2d. Rather, it focused on whether condemnation of the subject property constituted a "sale" under paragraph 2d(iii). The court concluded that it did not because it was not a free and voluntary transfer of the property. For that proposition, the court relied on case law in the field of taxation which holds that a loss suffered as a result of a mortgage foreclosure is not the same as a loss resulting from the "sale" of an asset within the meaning of the Internal Revenue Code. See Commissioner of Internal Revenue v. Freihofer, 102 F.2d 787, 788-89 (3rd Cir. 1939).
If, as the trial court assumed, it is necessary to decide whether the condemnation constituted a "sale" under paragraph 2d(iii), our view is that that issue should not be resolved based on cases decided in the field of taxation. Indeed, some courts dealing specifically with condemnation proceedings have held that acquisition of property in condemnation in fact constitutes a sale or exchange of property for income tax purposes. See Feinberg v. Commissioner of Internal Revenue, 377 F.2d 21, 26 (8th Cir.1967); Hawaiian Gas Prods. v. Commissioner, Internal Revenue, 126 F.2d 4, 5 (9th Cir.), cert. denied, 317 U.S. 653, 63 S.Ct. 48, 87 L.Ed. 525 (1942) (same); Simpson v. Timber Co. Dep't of Revenue, 326 Or. 370, 953 P.2d 366, 369-70 (1998) (same). However, none of these cases are on point because their holdings are based on legislative intent and underlying tax policy considerations. In contrast, the issue in this case is the contractual intent of two private parties.
In seeking to discover the intentions of the parties, courts generally consider the contractual terms, the surrounding circumstances, and the purpose of the *430 contract. Caruso v. Ravenswood Developers, Inc., 337 N.J.Super. 499, 506, 767 A.2d 979 (App.Div.2001) (citing Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282, 633 A.2d 531 (1993)). Here, the surrounding circumstances were plaintiff's intention to sell the license because it could no longer use it, and Bassinder's desire to construct a licensed facility on his leased premises. By its very terms, the evident purpose of paragraph 2d was to trigger Bassinder's obligation to pay the balance of the contract price when he voluntarily divested himself of either the premises or the license. Each occurrence listed under paragraph 2d presupposes such a voluntary act. Further, under five of the six "occurrences" listed, that voluntary act by Bassinder will result in consideration paid to him for the sale or transfer. Termination of his leaseholds as a result of the condemnation was hardly voluntary, and it clearly did not yield pecuniary gain. Indeed, Bassinder vigorously participated in the condemnation action, but without success. We therefore conclude that the condemnation of Ric-Cic's property did not constitute a "sale" under paragraph 2d(iii).

III
Plaintiff also argues that Bassinder voluntarily terminated his leases, thereby triggering paragraph 2d(v) of the agreement. It relies on the fact that Bassinder's attorney wrote a letter to Ric-Ric in December 1998, claiming that, by virtue of the condemnation of the property, his mortgage payment was no longer due and payable. We do not agree. At no time did Bassinder ever voluntarily terminate his leases. Indeed, the related condemnation litigation amply demonstrated that he defended the leases vigorously, and took the position that he in fact held fee title to the subject property.
Additionally, we agree with Bassinder that a mortgagor may in fact be relieved of its obligation to make payments on a mortgage after a condemnation award has been paid into court and funds are available for withdrawal by the mortgagee. See City of Orange Township v. Empire Mtg. Services, Inc., 341 N.J.Super. 216, 225, 775 A.2d 174 (App.Div.2001). Under this view, Bassinder's reluctance to continue making mortgage payments to Ric-Cic following the commencement of the condemnation proceedings would not necessarily be deemed a voluntary termination of the leases. Moreover, on the record before us, we do not know whether the applicable provisions in the mortgage gave Bassinder the right to stop making payments. In any event, we agree with the trial court's determination that Bassinder did not voluntarily surrendered his interest in the leased premises.
Finally, we reject plaintiff's argument that the executory nature of the parties' agreement required that Bassinder, as the "vendee" and "equitable owner" of the property, bear the risk of condemnation. This was not an executory contract for the sale of real property where title had not yet passed to the purchaser. Cf. Cox v. RKA Corp., 164 N.J. 487, 494-95, 753 A.2d 1112 (2000) (if vendor cannot properly convey title as contracted for, the purchaser, as equitable owner, may assert rights to recover any payments made). Rather, Bassinder became legal owner of the liquor license upon execution of the agreement and transfer of the license by the City. He was obligated to pay an additional $207,500 only if certain events occurred. As such, he was not "equitable owner," and did not bear the risk of anything except as specifically bargained for by the parties and as set forth in the agreement.
Affirmed.
NOTES
[1] Ric-Cic Co., a partnership, was the fee title owner of the land on which the pier was built.
[2] Bassinder bought out the interests of his partners, the other signatories of the agreement who are named as party defendants in this action. These defendants did not participate in the trial, nor do they participate in this appeal. Therefore, instead of referring to all defendants, reference is made only to Bassinder.
[3] Further, paragraph 2d(iv), which calls for payment upon Bassinder's assignment of his leases to a third party, does not trigger repayment because, as noted, his interest in the leases had been extinguished by virtue of the City's declaration of taking and condemnation proceedings.